IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THOMAS ASHMORE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:03-CV-3102-P |
| ERICSSON INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant Ericsson Inc.'s Motion for Summary Judgment, filed April 4, 2005. Plaintiff Thomas Ashmore, proceeding *pro se*, filed a Motion for the Appointment of Counsel and Motion for Summary Judgment on April 20, 2005.[1] After considering the parties' arguments and briefings, and the applicable law, the Court GRANTS Defendant's Motion for Summary Judgment, and DENIES Plaintiff's Motion for Summary Judgment.[2]

## I.  Background and Procedural History

This is largely a Title VII case in which Plaintiff asserts claims of disparate treatment and hostile work environment. Additionally, Plaintiff brings claims of breach of implied contract and defamation.

---

[1] On April 26, 2005, Magistrate Judge Jeff Kaplan denied Plaintiff's Motion for the Appointment of Counsel, but noted that Plaintiff could "reurge his motion after [this Court ruled] on defendant's motion for summary judgment."

[2] In his Motion for Summary Judgment, Plaintiff neither offers responds to Defendant's Motion for Summary Judgment, nor does he offer any legal support or evidence for his own. Rather, Plaintiff reasserts his motion for the appointment of counsel, and touts Defendant thwarted national security.

3:03-CV-3102-P
Order GRANTING Defendant's Motion for Summary Judgment and DENYING Plaintiff's Motion for
Summary Judgment
Page 1

On or about December 20, 1999, Plaintiff, who is Black, "submitted an employment application to [Defendant] . . . and, thereafter, interviewed for a 'Senior Test Engineer Technician' position (also known as 'Engineering Technician IV')." Def.'s Br. at 6 (citing Horton Aff. ¶ 2 (Def.'s App. at 16)). Subsequently, on January 7, 2000, Defendant "decided to offer [Plaintiff] the position of Senior Test Engineer Technician at an annual starting salary of $47,000." Id. at 7 (citing Horton Aff. ¶ 2 (Def.'s App. at 17)). Plaintiff's employment application stated his application would be on an at-will basis. See Ashmore dep. Ex. 4 (Def.'s App. at 194).

"As an Engineering Technician, Ashmore worked in Ericsson's 'Global Repair Center' in its Plano, Texas facility." Def.'s Br. at 7 (citing Horton Aff. ¶ 5 (Def.'s App. at 17-18)). While there, Plaintiff reported to Tim Horton ("Horton"), "who was his direct supervisor for approximately six months." Id. (citing Horton Aff. ¶ 7 (Def.'s App. at 18). Subsequently, "[Horton] became responsible for the Global Engineering department, and Chase Swinford [("Swinford")] became [Plaintiff's] immediate supervisor." Horton Aff. ¶ 7 (Def.'s App. at 18). Swinford reported directly to Horton. Id.

"[Plaintiff] was one of three Engineering Technicians in his group, which included Richard Peng [("Peng")] and Bill Nichols [("Nichols")]." Def.'s Br. at 7 (citing Swinford Aff. ¶ 3 (Def.'s App. at 214)). Swinford designated Nichols "as the 'lead' technician of the three, which generally meant that Nichols parceled out the tasks assigned to the group or handled individual problems that arose in the repair center." Id. at 7-8 (citing Swinford Aff. ¶ 3 (Def.'s App. at 214)).

"Employees in the Global Repair Center provided repair services to component level of Ericsson radio-based station equipment, included testing, fault finding, and upgrades." Horton Aff. ¶ 6 (Def.'s App. at 18). Plaintiff's responsibilities included performing "maintenance and repair at the work stations of other employees in the Global Repair Center." Def.'s Br. at 8 (citing Horton Aff. ¶ 6 (Def.'s App. at 18)).

Plaintiff received his first performance review, "approximately eight months after he began his employment [with Defendant] . . . ." Def.'s Br. at 9 (citing Ashmore dep. Ex. 11 (Def.'s App. at 197-98)). Therein, Swinford reported that while "[Plaintiff's] objectives [were] on track for all items within his control," . . . he "[needed] to work on his team working skills, communication skills, become more thorough in his tasks, and learn more about maintaining the other test stations . . . ." *Id.* Plaintiff received his second performance review on February 1, 2001. It stated that while Plaintiff had "improved his communications and team working skills," he still needed "to expand his knowledge of the other test stations supported in the repair center in order to increase his involvement in the maintenance of those test stations." Ashmore dep. Ex. 12 (Def.'s App. at 199). Swinford and Horton noted further that Plaintiff needed "to have a better understanding of the importance of keeping the repair center testers operational and make it his top priority." *Id.*

Plaintiff's third performance review noted his key contributions during the review period, but "scored [him] as 'Off Track' in the category of 'Internal Efficiency & Innovation . . . .'" Def.'s Br. at 9 (citing Ashmore dep. Ex. 13 (Def.'s App. at 202)). Additionally, it stated that "[Plaintiff's objectives [were] not on track," that he needed "to focus on meeting these objectives

by year-end," and that he needed "to learn how to maintain additional test systems in the repair

center." Ashmore dep. Ex. 13 (Def.'s App. at 202).

On April 23, 2002, Plaintiff received a written warning from Swinford. *See* Ashmore

dep. at p. 213, ll. 13-18; Ashmore dep. Ex. 16 (Def.'s App. at 101;210). Swinford reproved

Plaintiff throughout, informing him that he did not focus on tasks at hand, and took too long to

perform routine maintenance. Ashmore dep. Ex. 16 (Def.'s App. at 210). Moreover, Swinford

admonished Plaintiff that "[a]ny further instances of poor performance in the maintenance and

repair of test stations will result in further disciplinary action up to and including termination."

*Id.*

Aside from work performance issues, Plaintiff also encountered difficulties with co-

workers during his tenure with Defendant. *See* Ashmore dep. at p. 147, l. 25 to p. 148, l. 3

(Def.'s App. at 55-56). For example Plaintiff experienced complications with Peng. Def.'s Br.

at 11 (Swinford Aff. ¶ 6 (Def.'s App. at 215)). The conflict escalated to the point where

Swinford had to intervene between the two workers. *See* Ashmore dep. at p. 153, l. 12 to p. 154,

l. 8; Swinford Aff. ¶ 6 (Def.'s App. at 61-61; 215). "In order to limit their disagreements,

[Swinford] asked each of them to speak with each other only about work-related issues."[3]

Swinford Aff. ¶ 6 (Def.'s App. at 215).

Plaintiff encountered conflicts with other co-workers as well. "In June of 2001,

[Plaintiff] was involved in an incident with . . . Ann Nyugen [("Nyugen")], which arose out of

---

[3] Previous to this request, Plaintiff alleges that Peng told him "I don't like you," called him an "idiot" and a "dummy," and physically threatened Plaintiff by telling him Peng had a "first degree black belt." *See* Ashmore dep. at p. 199, ll. 11-25; p. 353, l. 8 to p. 354, l. 24 (Def.'s App. at 98; 148-49).

3:03-CV-3102-P
**Order GRANTING Defendant's Motion for Summary Judgment and DENYING Plaintiff's Motion for Summary Judgment**
**Page 4**

[Plaintiff's] work at Nyugen's work bench." Def.'s Br. at 11-12 (citing Swinford Aff. ¶ 7

(Def.'s App. at 215). As with Peng, this difficulty required Swinford's intervention. *See*

Ashmore dep. at p. 155, l. 10 to p. 157, l. 14; Swinford Aff. ¶ 7 (Def.'s App. at 63-65; 215). One

month later, Plaintiff encountered yet another confrontation with "a test repair technician, Hong

Bui [("Bui")]," over Plaintiff moving Bui's cell phone.[4] Swinford Aff. ¶ 8 (Def.'s App. at 216);

*see also* Ashmore dep. at p. 159, l. 3 to p. 161, l. 11 (Def.'s App. at 67-69). Again, Swinford

intervened.[5] Swinford Aff. ¶ 8 (Def.'s App. at 216). Finally, "in October 2001, [Plaintiff]

accused Boris Medic [("Medic")] . . . of having information about and / or being involved in the

September 11, 2001 terrorist attacks in New York City."[6] Def.'s Br. at 13 (citing Ashmore dep.

at p. 183, l. 9 to p. 184, l. 6; Swinford Aff. ¶ 9 (Def.'s App. at 91-92; 216)). Soon afterward,

Medic complained to Swinford and Horton that Plaintiff was harassing him regarding the

attacks. Swinford Aff. ¶ 9 (Def.'s App. at 216).

   "As a result of the Medic incident, and in light of the three prior incidents . . . Swinford

and Horton issued a written warning to [Plaintiff] on October 16, 2001, for 'repetitive and

unprofessional conduct in the work place.'" Def.'s Br. at 13 (citing Ashmore dep. at p. 148, ll.

13-22; Ashmore dep. Ex. 15 (Def.'s App. at 56; 207-08)). The written warning recounts

---

[4] During this confrontation, Plaintiff alleges that Bui taunted him saying "I dare you to touch my phone again." *See* Ashmore dep. at p. 159, l. 3 to p. 161, l. 11 (Def.'s App. at 67-69).

[5] Eventually Swinford asked Plaintiff to use a third party, or "go-between," when communicating with several of his coworkers. *See* Ashmore dep. at p. 252, ll. 6-22 (Def.'s App. at 114).

[6] "[Plaintiff] notified the FBI of his suspicions," after which an investigation occurred. *See* Ashmore dep. at p. 183, ll. 20-25 (Def.'s App. at 91). The FBI then "informed [Defendant] that they did not expect [Defendant] would be hearing anything further from them." Carlson Aff. ¶ 2 (Def.'s App. at 235-36). Apparently, Plaintiff was unaware of this result. *See* Ashmore dep. at p. 187, ll. 19-23 (Def.'s App. at 93).

Plaintiff's difficulties with Peng, Nyugen, Bui, and Medic, and warns that "[a]ny further instances of harassment, [] inability to communicate, or work professionally with anyone within [the organization] will result in further disciplinary action up to and including termination." Ashmore dep. Ex. 15 (Def.'s App. at 207-08).

"By summer 2002, the volume of work in the Global Repair Center had dramatically decreased, and [Defendant] was forced to reduce personnel." Def.'s Br. at 14 (citing Horton Aff. ¶ 10 (Def.'s App. at 20)). Defendant laid off thirteen individuals in the Global Repair Center, including Plaintiff. *See* Horton Aff. ¶ 12 (Def.'s App. at 21). At that time, three Engineering Technician IVs worked in the Global Repair Center. *Id.* at ¶ 10. (Def.'s App. at 20). "Horton, the manager of the Hardware Operations Unit . . . evaluated and ranked the three Engineering Technician IVs . . . ." Def.'s Br. at 14 (citing Horton Aff. ¶ 10 (Def.'s App. at 20)). Plaintiff received lower scores than the other two employees on those evaluations.[7] *See* Horton Aff. ¶ 11 (Def.'s App. at 20). Thereafter, on or about July 19, 2002, Defendant discharged Plaintiff.[8] *Id.* "Soon after [Plaintiff's] discharge, [Defendant] eliminated and outsourced all of the Global Repair Center." Horton Aff. ¶ 13 (Def.'s App. at 21).

"Following his discharge, . . . [Plaintiff] filed a Charge of Discrimination with the Equal Employment Opportunity Commission [("EEOC")] and Texas Commission on Human Rights."[9]

---

[7] "[Plaintiff] received a 'competence' score of 2, and the other two engineering technicians . . . received competence scores of 4." Additionally, "[Plaintiff] received an 'overall performance' score of 2," while "[t]he other two engineering technicians received a 3 and 4 on their overall performance." Horton Aff. ¶ 11 (Def.'s App. at 20).

[8] "[Horton] made the final decision to discharge [Plaintiff] . . . ." Horton Aff. ¶ 11 (Def.'s App. at 20).

[9] On August 7, 2002, Plaintiff filed an amended Charge with the EEOC. *See* Def.'s App. at 238-39.

Def.'s Br. at 16 (citing Ashmore dep. at p. 242, l. 13 to p. 243, l. 15; Ashmore dep. Ex. 20

(Def.'s App. at 109-10; 211)). Thereafter, "[o]n September 30, 2003, the EEOC issued a

Dismissal and Notice of Rights to sue. *Id.* (citing Ashmore dep. at p. 246, ll. 3-18; Ashmore dep.

Ex. 21 (Def.'s App. at 112; 212)). Finally, "[o]n December 31, 2003, [Plaintiff] filed his

Original Complaint . . . [which] appears to allege claims of (i) race discrimination based on

disparate treatment; (ii) race discrimination based on a hostile work environment; (iii)

defamation; and (iv) breach-of-implied contract." *Id.* (citing Pl.'s Complaint).

## II.     Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All evidence and the

reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the

party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The

moving party bears the burden of informing the district court of the basis for its belief that there

is an absence of a genuine issue for trial, and of identifying those portions of the record that

demonstrate such an absence. *Celotex*, 477 U.S. at 323.

Once the moving party has made an initial showing, the party opposing the motion must

come forward with competent summary judgment evidence of the existence of a material fact

issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The

party defending against the motion for summary judgment cannot defeat the motion unless she

provides specific facts that show the case presents a genuine issue of material fact, such that a

reasonable jury might return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248-50; *Abbott v. Equity Group*, 2 F.3d 613, 619 (5th Cir. 1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trail, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

Finally, the Court has not duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.* However, since a *pro se* plaintiff does not have the same knowledge and skill as a trained attorney, the Court will "accord a *pro se* plaintiff some measure of latitude in [the] complaint and in the errors" that might be made. *Newsome v. EEOC*, 301 F.3d 227, 233 (5th Cir. 2002). Accordingly, the Court searched the entire record in an effort to find evidence supporting Plaintiff's assertion of racial discrimination, defamation or breach of implied contract.

## III.    Race Discrimination

"Title VII provides that 'it shall be an unlawful employment practice for an employer-- (1) to fail or refuse to hire or to discharge any individual . . . because of such individual's race,

color, religion, sex, or national origin.'" *Meinecke v. H & R Block*, 66 F.3d 77, 83 (5th Cir.

1995) (quoting 42 U.S.C. § 2000e-2(a)(1)).  In order to survive Defendant's Motion for

Summary Judgment, Plaintiff must first establish, by a preponderance of the evidence, a prima

facie case of race discrimination.  *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 404

(5th Cir. 1999).  To establish a prima facie case of discrimination, a plaintiff may prove his

claim through direct evidence, statistical proof, or the tripartite burden-shifting test established

by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973); *see*

*also Urbano v. Continental Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).

> a.    **The McDonnell Douglas Framework**

Under the McDonnell Douglas test, a prima facie case of race discrimination is

established by a plaintiff once he proves that:  (1) he is a member of a protected class; (2) that he

was qualified for his position; (3) that he suffered an adverse employment action; and (4) that

others similarly situated were treated more favorably.  *See generally Okoye v. Univ. of Tex.*

*Houston Health Sci. Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001); *Shackelford*, 190 F.3d at 404; *Ward*

*v. Bechtel Corp.*, 102 F.3d 199, 201 (5th Cir. 1997).

The prima facie case, once established, raise a presumption of discrimination which the

defendant must rebut by articulating legitimate, nondiscriminatory reasons for its actions.

*Shackelford*, 190 F.3d at 404.  This burden on the employer is only one of production, not

persuasion, involving no credibility assessments.  *Russell v. McKinney Hosp. Venture*, 235 F.3d

219, 222 (5th Cir. 2000).  If the employer carries its burden, the mandatory inference of

discrimination created by the prima facie case drops out of the picture, and the plaintiff must

prove that the proffered reasons are pretextual.  *Id.*  "Once a Title VII case reaches the pretext

stage, the only question on summary judgment is whether there is a conflict in substantial

evidence to create a jury question regarding discrimination." *Shackelford*, 190 F.3d at 404

(citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989,993 (5th Cir. 1996)).  The ultimate burden of

persuasion rests squarely on the plaintiff.  *See Marcantel v. Louisiana Dep't of Transp. & Dev.*,

37 F.3d 197, 200 (5th Cir. 1994).

In this case, Plaintiff brings claims of racial discrimination based on disparate treatment

and hostile work environment.

### b.      Disparate Treatment

Defendant classifies Plaintiff's allegations of disparate treatment into four separate

categories.  Namely, that:  (1) Defendant promised Plaintiff the "lead" technician position in the

offer of employment; (2) Swinford issued a written warning to Plaintiff, and that complaints to

human resources would be reversed back to Plaintiff; (3) Defendant required Plaintiff to use a

"go-between" to communicate with particular coworkers; and (4) Defendant terminated

Plaintiff.[10]  The Court addresses first the second and third allegations.

### i.      No Ultimate Employment Decision

"Not every action taken by an employer that makes an employee unhappy constitutes an

actionable adverse employment action . . . ." Def.'s Br. at 21.  "Title VII was designed to

address ultimate employment decisions, not to address every decision made by employers that

---

[10] Plaintiff does not specifically name all of these individual allegations in his Complaint.  Rather, they are compiled from the Complaint, responses to Defendant's interrogatories, and Plaintiff's deposition.  Nevertheless, in order to give Plaintiff the benefit of the doubt, and because Defendant addressed each category *substantially* in its Motion for Summary Judgment, the Court analyzes each allegation to the extent needed.

arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77

F.3d 777, 781-82 (5th Cir. 1995). "Ultimate employment decisions include acts such as hiring,

granting leave, discharging, promoting, and compensating." *Mattern v. Eastman Kodak Co.*, 104

F.3d 702, 707 (5th Cir. 1997). Conversely, actions such as "hostility from fellow employees,

having tools stolen . . . verbal threats of being fired . . . [and] a missed pay increase" do not rise

to ultimate employment decisions. *Id.* at 707-08. "To hold otherwise would be to expand the

definition of 'adverse employment action' to include events such as disciplinary filings,

supervisor's reprimands, and even poor performance by the employee--anything which *might*

jeopardize employment in the future. Such expansion is unwarranted." *Id.* at 708. Plaintiff's

allegations of written warnings, reverse complaints, and go-betweens cannot qualify as ultimate

decisions. At best, they amount to tangential effects on possible future employment decisions.

*Id.*

Plaintiff's first allegation fails in a similar manner. "The 'lead' engineering technician

position in the Global Repair Center was not a formal Ericsson position that necessarily resulted

in a change in compensation or benefits." Horton Aff. ¶ 4 (Def.'s App. at 17). Rather, it "was

an informal designation and means for [Defendant] to put a person in charge of assigning the

group tasks and handling individual problems that arose in the Repair Center." Swinford aff. ¶ 3

(Def.'s App. at 214). As such, the promise of the lead position cannot "constitute [an] 'adverse

employment action' because of [its] lack of consequence." *Mattern*, 104 F.3d at 708.

ii.     **Lack of Pretext**

Notwithstanding the first three claims, Plaintiff's final allegation of termination meets the

definition of an ultimate employment decision. *See Pegram v. Honeywell, Inc.*, 361 F.3d 272,

282-83 (5th Cir. 2004) ("Even under this court's stringent 'ultimate employment action'

standard, it is beyond dispute that a termination constitutes an adverse action."). Indeed, for

purposes of its Motion for Summary Judgment, Defendant "does not challenge [Plaintiff's]

ability to satisfy the prima facie standard with respect to his termination." Pl.'s Br. at 29

(emphasis removed).

"In a discharge case, the plaintiff must prove a prima facie case of discrimination by

showing (1) that [he] is a member of a protected group; (2) that [he] was qualified for the job

[he] held; and (3) that [he] was discharged . . . ." *Norris v. Hartmarx*, 913 F.2d 253, 254 (5th

Cir. 1990). Normally, there is a fourth element "that after [his] discharge, [his] employer filled

the position with a person who is not a member of the protected group." *Id.* However, "[i]n

cases where the employer discharges the plaintiff and does not plan to replace [him], . . . the

fourth element is, 'more appropriately, that after [the] discharge others who were not members

of the protected class remained in similar positions.'"[11] *Meinecke*, 66 F.3d at 83 (alteration in

original) (quoting *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990)).

Defendant proffers that it "had a legitimate, non-discriminatory reason for terminating

[Plaintiff] – its reduction in force." Def.'s Br. at 29. The Fifth Circuit routinely recognizes

---

[11] "[Plaintiff] does not allege that, after being terminated, his position was reassigned to a White person." Def.'s Br. at 12 n.5 (citing Ashmore dep. at p. 258, l. 3 to p. 260, l. 2 (Def.'s App. at 117-19)).

3:03-CV-3102-P
**Order GRANTING Defendant's Motion for Summary Judgment and DENYING Plaintiff's Motion for Summary Judgment**
**Page 12**

reductions in force, or "RIFs" as valid termination decisions.  *See, e.g., EEOC v. Texas*

*Instruments Inc.*, 100 F.3d 1173, 1181 ("In the context of a reduction in force, which is itself a

legitimate, nondiscriminatory reason for discharge, the fact that an employee is qualified for his

job is less relevant--some employees may have to be let go despite competent performance.").

Indeed, Plaintiff recognized the legitimacy of the RIF in July 2002.  *See* Ashmore dep. at p. 326,

ll. 5-13 (Def.'s App. at 135).  "He also acknowledged that, at the time he was laid off,

[Defendant] also laid off twelve other employees in the Global Repair Center and that, after his

lay off, he was not replaced by anyone else." Def.'s Br. at 30 (citing Ashmore dep. at p. 234, ll.

20-23; p. 241, l. 22 to p. 242, l. 8; p. 326, ll. 11-20 (Def.'s App. at 107; 108-09; 135)).

Moreover, "[Defendant] used an objective method for evaluating employees and ranking them

according to their 'competence' and 'overall performance.'" Def.'s Br. at 29 (citing Horton Aff.

at ¶¶ 10-12 (Def.'s App. at 20-21)).

 Finally, Defendant highlights that Horton "was the ultimate decision-maker concerning

[Plaintiff's] hiring and firing, thereby belying any notion of racial animus toward [Plaintiff]."

Def.'s Br. at 32 (citing Horton Aff. at ¶¶ 2, 11 (Def.'s App. at 16-17; 20)).  "The same actor

inference . . . assumes that where the same person does the hiring and firing of an individual, the

firing was not likely to have been a result of improper discriminatory motive."  *Tellepsen*

*Pipeline Services Co. v. NLRB*, 320 F.3d 554, 570 n.4 (5th Cir. 2003).  "The reason for the

doctrine is that the decision maker's presumed animus against the protected class, as the motive

for the termination, is inconsistent with the decision to hire the plaintiff in the first place."

*Winter v. Bank of America, N.A.*, No. Civ.A.3:02-CV-1591-L, 2003 WL 23200278, at *8 (N.D. Tex. Dec. 12, 2003).

Plaintiff does not dispute the RIF, or that Horton hired and fired him. Indeed, the record contains no evidence to the contrary. In short, Plaintiff cannot show pretext. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment with respect to Plaintiff's disparate treatment claim.

### c.   Hostile Work Environment

In order to establish a prima facie case of a hostile work environment claim, a plaintiff must show that:  (1) he is a member of a protected class; (2) he was subjected to harassment; (3) the harassment was based on the protected trait; (4) the harassment affected a term or condition of his employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *See Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996); *Collins v. Baptist Memorial Geriatric Ctr.*, 937 F.2d 190, 195 (5th Cir. 1991). Whether an environment is hostile or abusive depends on the totality of the circumstances, with a focus on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance. *See Long*, 88 F.3d at 309; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993).

To survive summary judgment on a hostile work environment claim, a plaintiff must produce enough evidence that a reasonable jury could find that the alleged harassment was not merely sporadic but that the workplace was "permeated with discriminatory intimidation,

ridicule and insult . . . sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." *Harris*, 510 U.S. at 21; *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995). "The Supreme Court has contrasted physically threatening or humiliating conduct, which will support a claim for hostile work environment, from a 'mere offensive utterance' which will not." *Long*, 88 F.3d at 309; *see also Harris*, 510 U.S. at 21. Conduct that is not severe or pervasive enough to create an objectively hostile work environment is beyond Title VII's purview. *See DeAngelis*, 51 F.3d at 594. The Fifth Circuit has held that the mere utterance of an epithet which engenders offensive feelings in an employee is not, taken alone, sufficient to support Title VII liability. *See, e.g., Farpell-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996); *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *DeAngelis*, 51 F.3d at 594.

In this case, Defendant argues that Plaintiff cannot prove harassment based on race, and that any alleged conduct is insufficient to support a hostile work environment claim.

### i.    Racial Evidence

A thorough review of the record reveals no evidence that any of the alleged conduct occurred because of race. Indeed, despite Plaintiff's perceived contentions to the contrary, affirmative evidence exists that such words or actions happened for other, unspecified reasons. *See* Ashmore dep. at p. 199, l. 11 to p. 202, l. 22 ; p. 261, l. 15 to p. 262, l. 14; p. 287, l. 20 to p. 288, l. 11; p. 352, l. 13 to p. 354, l. 24; p. 358, l. 23 to p. 359, l.5; p. 364, ll. 1-3; p. 380, ll. 21-25 (Def.'s App. 98-100; 120-21; 130-31; 147-49; 152-53; 156; 166). Indeed, the record shows that any alleged statements or physical threats, were facially neutral. "[Plaintiff] simply subjectively

believes that he was harassed because of his race, which is not enough to establish that race was

a motivating factor for his disagreements with [his] co-workers." Def.'s Br. at 36 (citing *Pickens*

*v. Shell Tech. Ventures Inc.*, No. 04-20272, 2004 WL 2980291 (5th Cir. 2004)). Finally, even if

phrases such as "idiot," "dummy," and "I don't like you" were racially motivated, they would

still lack the requisite severity for Title VII liability. *See Indest v. Freeman Decorating, Inc.*,

164 F.3d 258, 264 (5th Cir. 1999).

### ii.        Harassing Conduct

"Similarly, [Plaintiff's] perceived physical 'threats' involved nothing more than

statements and incidents that are facially neutral, and [Plaintiff] has absolutely no evidence

linking them to race." Def.'s Br. at 36.  Furthermore, as with the alleged racial statements, the

perceived physical threats that included "I dare you to touch my cell phone," and "I have a first

degree black belt," fail to rise to the level of viable Title VII charges. *See Weller v. Citation Oil*

*& Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) ("Title VII was only meant to bar conduct that is

so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the

workplace."). Hence, such conduct falls short of Title VII liability. Because the workplace was

not "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently

severe or pervasive to alter the conditions of the [Plaintiff's] employment and create an abusive

working environment," no violation occurred. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993) (internal citations omitted).  Accordingly, the Court GRANTS Defendant's Motion for

Summary Judgment with respect to Plaintiff's hostile work environment claim.

## V.    Defamation

Defendant argues first that Defendant's defamation claim is time-barred.  Texas law

states that "[a] person must bring suit for . . . libel [or] slander . . . not later than one year after

the day the cause of action accrues."  Tex. Civ. Prac. & Rem. Code Ann. § 16.002 (Vernon

2004).  "The written warnings upon which [Plaintiff] bases his defamation claim were issued on

October 16, 2001 and April 23, 2002, respectively.  [Plaintiff] filed his lawsuit on December 31,

2003, more than one year after both of these written warnings were issued."  Def.'s Br. at 40

(citing Ashmore dep. at p. 273, ll. 7-20 (Def.'s App. at 125)).  Therefore, the statute of

limitations bars this claim.

Notwithstanding the statute of limitations, the defamation claim fails on the merits.[12]

Texas law defines defamation as a "defamatory statement orally communicated or published to a

third person without legal excuse."  *Halbert v. City of Sherman*, 33 F.3d 526, 530 (5th Cir.

1994); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).  In order to

prevail on a defamation claim, the plaintiff must show that the person publishing the allegedly

defamatory statement knew or should have known that the statement was false.  *See Foster v.*

*Laredo Newspapers, Inc.*, 541 F.W.2d 809, 819 (Tex. 1976) *cert. denied*, 429 U.S. 1123 (1977).

Truth represents an absolute defense to a cause of action for defamation which, if proved,

entirely defeats the plaintiff's claim.  *Randall's Food*, 891 S.W.2d at 646; *see also McIlvain v.*

*Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990).

---

[12] Although the deposition testimony highlights that two of the memoranda were prepared more than a year before Plaintiff filed his lawsuit, Defendant's record fails to contain a full account of what happened with other warnings or memoranda that may have contained false statements.  *See* Ashmore dep. at p. 273, ll. 18-25 (Def.'s App. at 125) (cutting short an answer by Plaintiff that talks of other fraudulent statements).  Hence, in order to view everything in the light most favorable to a *pro se* plaintiff, the Court examines the defamation claim on its merits.

A claim for defamation may also be avoided if the defendant's statements were qualifiedly privileged. "A qualified privilege protects statements made in good faith on a subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty." *Halbert*, 33 F.3d at 530 (citing *Houston v. Grocers Supply Co.*, 625 S.W.2d 798, 800 (Tex.App.--Houston [14th Dist.] 1981, no writ)). "Accusations, or comments about an employee by her employer, made to a person having an interest or duty in the matter to which the communication relates, have a qualified privilege." *Schauer v. Memorial Care Sys*, 856 S.W.2d 437, 449 (Tex.App.--Houston [1st Dist.] 1993). A statement, though privileged, may nevertheless be actionable if it is shown that the publisher was motivated by actual malice at the time the statement was made. *See Randall's Food*, 891 S.W.2d at 646. In connection with defamation claims, actual malice refers not to ill will, but rather to "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 313 (5th Cir. 1995) (quoting *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989)). Clear and convincing evidence of malice is required in order to defeat a qualified privilege. *Id.* (citing *Howell v. Hecht*, 821 S.W.2d 627, 630 (Tex.App.--Dallas 1991, writ denied).

Furthermore, whereas Texas courts ordinarily place the burden on the defendant to prove lack of malice on summary judgment, in a federal forum it is the plaintiff who, under the applicable summary judgment standard, must adduce proof of malice in order to avoid entry of summary judgment against him, since state law requires the plaintiff to demonstrate such malice at trial. *Compare Randall's Food*, 891 S.W.2d at 646 (holding that an employer must

conclusively establish absence of malice on summary judgment) *with Duffy*, 44 F.3d at 313

(citing *Celotex* to conclude that the burden of showing malice rests upon the plaintiff); *see also*

*ContiCommodity Services, Inc. v. Ragan*, 63 F.3d 438, 443 (5th Cir. 1995).

In this case, the defamation claim fails because the statements were either true or

qualifiedly privileged.  Before issuing the written statements, "[Swinford] investigated concerns

raised with respect to [Plaintiff] by speaking to the employees involved and with [Plaintiff]

himself."  Def.'s Br. at 42 (citing Swinford Aff. ¶¶ 6-10, 15-17 (Def.'s App. at 215-17, 218-19)).

Moreover, Swinford reviewed the written statements with Horton before they were issued.

Swinford Aff. ¶¶ 9, 16 (Def.'s App. at 216, 219).  In short, there is no reason to believe

Defendant issued the written statements in bad faith or with actual malice.  Finally, there is no

reason to believe that anyone other than Plaintiff, Swinford, Horton and Ann Carlson received

notice or communication regarding the written statements.  Swinford Aff. ¶¶ 11, 17 (Def.'s App.

at 217, 219); *see also* Ashmore dep. at p. 276, ll. 3-22 (Def.'s App. at 126).  Accordingly, the

Court GRANTS Defendant's Motion for Summary Judgment with respect to Plaintiff's

defamation claim.

## VI.    Breach of Implied Contract

"The elements of a breach of contract claim are:  (1) the existence of a valid contract; (2)

the plaintiff performed; (3) the defendant breached the contract; and (4) the plaintiff was

damaged as a result of the breach."  *Williams v. First Tennessee Nat'l Corp.*, 97 S.W.3d 798, 802

(Tex.App.--Dallas [5th Dist.] 2003).  In order for oral statements to modify at-will employment

and create an employment contract, "the employer must unequivocally indicate a definite intent

to be bound not to terminate the employee except under clearly specified circumstances. General comments that an employee will not be discharged as long as his work is satisfactory do not in themselves manifest such an intent." *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) [hereinafter *Montgomery*]. "Courts must distinguish between carefully developed employer representations upon which an employee may justifiably rely, and general platitudes, vague assurances, praise, and indefinite promises of permanent continued employment." *Hayes v. Eateries, Inc.*, 905 P.2d 778, 783 (Okla. 1995). Furthermore, "[i]t is the burden of the discharged employee who asserts that the parties have contractually agreed to limit the employer's right to terminate the employee to prove an express agreement or written representation to that effect." *Ed Rachal Found. v. D'Unger*, 117 S.W.3d 348, 355 (Tex. App.-- Corpus Christi 2003, pet. filed)

In this case, Plaintiff "alleges that Horton promised him the 'lead' technician position," and "promised him 'training to allow him to remain competitive and employable.'" Def.'s Br. at 43-44 (citing Pl.'s Resp. to Interrog. No. 11; Ashmore dep. at p. 312, l. 16 to p. 313, l. 15 (Def.'s App. at 187-88;132-33)). Such promises fall well short of creating any type of contract. At best, the promises of "lead technician" and "competitive training," amount to vague assurances and indefinite promises. As said before, "an employer's oral statements do not modify an employee's at-will status absent a definite, stated intention to the contrary." *Montgomery*, 965 S.W.2d at 501. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment with respect to Plaintiff's breach of implied contract claim.

## VII.  Conclusion

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary

Judgment.

**It is so ordered.**

Signed this 20th day of June 2005.

JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE